IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARY P. ALEXANDER, | ) | CASE NO.  1:16-cv-00655 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Mary P. Alexander ("Plaintiff" or "Alexander") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her application for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 13.   As explained more fully below, the Court

**AFFIRMS** the Commissioner's decision.

## I.  Procedural History

Alexander protectively filed an application for Disability Insurance Benefits ("DIB")

("SSI") on May 24, 2010.[1]  Tr. 218, 385-391, 439.   Alexander alleged a disability onset date of

June 17, 2002, which was later amended to February 27, 2010.  Tr. 117-118, 218, 412.  She

alleged disability due to neck, left shoulder, back and feet problems, sleep apnea, weight loss,

high blood pressure, fatigue and depression.  Tr. 150, 170, 237, 247, 451.  Alexander's

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 2/16/2017).

application was denied initially (Tr. 237-240) and upon reconsideration by the state agency (Tr. 247-253).   Thereafter, she requested an administrative hearing.  Tr. 254.

On February 7, 2012, an administrative hearing was conducted by Administrative Law Judge Bassett ("ALJ Bassett").  Tr. 59-100.   On April 3, 2012, ALJ Bassett issued an unfavorable decision.  Tr. 194-210.  Following a request for review of the unfavorable decision, on May 25, 2013, the Appeals Council remanded the case back to an Administrative Law Judge to (1) further evaluate Alexander's mental impairments; (2) give further consideration to Alexander's maximum residual functional capacity and evaluate the treating and non-treating source opinions; and (3) if necessary, expand the record and obtain vocational expert testimony. Tr. 211-214, 218.

Pursuant to the Appeals Council's remand, on March 4, 2014, Administrative Law Judge Beekman ("ALJ") held an administrative hearing.  Tr. 101-131.  On September 29, 2014, the ALJ issued his decision.  Tr. 215-236.  In his decision, the ALJ determined that Alexander had not been under a disability within the meaning of the Social Security Act from February 27, 2010, through the date of the decision.  Tr. 219, 228.  Alexander requested review of the ALJ's decision by the Appeals Council.  Tr. 55-58.  On January 13, 2016, the Appeals Council denied Alexander's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence[2]

### A.    Personal, vocational and educational evidence

Alexander was born in 1965.  Tr. 385.  At the time of the March 4, 2014, hearing, she was 49 years of age.  Tr. 103.  Alexander has a high school education.  Tr. 104.  She worked as a

---

[2] Alexander's arguments pertain to the ALJ's analysis of her foot impairment.  Accordingly, the summary of evidence relates primarily to that impairment.

mail processing clerk for the U.S. Postal Service.  Tr. 104.   Alexander was injured at work and was off work from October 2009 through December 2009.  Tr. 112.   She attempted to go back to work in December 2009 but was still having a difficult time because standing really aggravated her back.  Tr. 112-113.  She completely stopped working in February 2010.  Tr. 113, 117-118.

**B.     Medical evidence**

   **1.     Treatment history**

   Alexander was treated by Robert Fumich, M.D., an orthopedic surgeon, and Mark Tozzi, M.D., a podiatrist, for problems with her feet.  *See e.g.,* Tr. 1434-1437, 2355-2379, 2380-2382. She complained of foot problems since at least March 2009.  Tr. 224, 2356.   Alexander had problems with plantar fasciitis and pronated flat feet.  Tr. 2356.  In March and April 2009, Alexander's plantar faciitis of the heel seemed to have improved but she had pronated flatfeet, pain along the posterior tib and peroneal tendons bilaterally and some heel pain.  Tr.  2356.  Dr. Fumich ordered orthotics and recommended that Alexander use ice and anti-inflammatories. Tr. 2356.  On September 8, 2009, Alexander had pronated flatfeet, no arch, and the posterior tib was swollen bilaterally, worse on the left than right.  Tr. 2356.  Dr. Fumich noted concern regarding a posterior tib tear since Alexander's work involved standing 8 hours a day on cement as a postal worker for the prior 14 years.  Tr.2356.  Dr. Fumich indicated that Alexander should use her arch supports and ice.  Tr. 2356.  He ordered MRIs of Alexander's foot and ankle.  Tr. 2356.  Dr. Fumich ordered Alexander off work from September 15, 2009, through September 21, 2009, due to bilateral foot pain.  Tr. 2359-2360.   On September 29, 2009, Dr. Fumich noted that Alexander had posterior tib dysfunction bilaterally and a split peroneous brevis on the left and requested a consultation with Dr. Tozzi.  Tr. 2356.

Alexander saw Dr. Tozzi on November 11, 2009.  Tr. 1435.  Dr. Tozzi noted various problems with Alexander's feet but did not believe that she was a surgical candidate.  Tr. 1435. Dr. Tozzi recommended that Alexander be treated conservatively unless her problems worsened over time, or there was evidence of a tear.  Tr. 1435.  Dr. Tozzi administered an injection in Alexander's left hindfoot and indicated that, once Alexander's left foot improved, he would consider an injection on the right side.  Tr. 1435.  Dr. Tozzi also prescribed Mobic.  Tr. 1435.

In February 2010, Alexander saw Dr. Tozzi.  Tr. 1435.  Dr. Tozzi noted that Alexander was doing fine.  Tr. 1435.  Alexander received a cortisone injection, her prescription for Mobic was renewed, and Dr. Tozzi recommended that Alexander continue to use her orthotics in her work shoes.  Tr. 1435.  When Alexander saw Dr. Tozzi on June 2, 2010, she was limping badly. Tr. 1435.  Alexander reported that her left foot/ankle was much worse than it had been.  Tr. 1435.  Dr. Tozzi ordered an MRI to determine whether Alexander had a tear in the posterior tendon.  Tr. 1435.  Following the MRI, Alexander saw Dr. Tozzi on June 21, 2010.  Tr. 1435. Dr. Tozzi indicated that there was "evidence of a grade PTTD [posterior tibial tendon dysfunction] with some tendinosis noted, in addition to some enlargement and fraying of the tendon, [but] . . . no frank tear."  Tr. 1435, 1436-1437.  Dr. Tozzi also noted that Alexander had "a significant valgus[3] in her left foot."  Tr. 1435.  Dr. Tozzi advised Alexander of the surgical procedure that might be necessary if the condition worsened but recommended foregoing surgery for the time being and having Alexander wear her brace to prevent worsening.  Tr. 1435.

On June 15, 2011, Alexander saw Dr. Tozzi complaining that her pain was disabling; both of Alexander's ankles, arches and heels were hurting.  Tr. 2215.  Dr. Tozzi observed that Alexander's condition seemed to be worsening but he was reluctant to proceed with surgery

---

[3] A "valgus" is "an abnormally turned position of a part of the bone structure of a human being[.]" http://www.dictionary.com/browse/valgus?s=t (last visited 2/16/2017).

because Alexander was "having pain in her low back, some major joint pain, and recalcitrant foot and ankle pain." Tr. 2215. Dr. Tozzi felt that Alexander's best option was to consult with a rheumatologist. Tr. 2215. Alexander saw Dr. Tozzi on September 19, 2011. Tr. 2215. Alexander's arthritis workup was negative for rheumatoid arthritis. Tr. 2215. Alexander complained of recalcitrant bilateral foot and ankle pain, stating that her feet hurt her from the time she wakes in the morning and the pain worsens with activity. Tr. 2215. Since conservative treatment had not made a great deal of different, Dr. Tozzi discussed surgery with Alexander. Tr. 2215.

Dr. Tozzi proceeded with arch reconstruction surgery on Alexander's left foot in October 2011. Tr. 2215, 2216-2217, 2357. Dr. Tozzi saw Alexander on October 24, 2011, for a post-operative visit. Tr. 2215. Dr. Tozzi removed the short leg cast and replaced it with a short leg, non-weightbearing fiberglass cast. Tr. 2215. Dr. Tozzi noted no complications and indicated that Alexander's x-rays looked excellent and the graft was in a good position to heal. Tr. 2215. On November 14, 2011, Dr. Tozzi removed Alexander's short leg cast and she was placed in a leg walker boot. Tr. 2215. Alexander was taking Vicodin intermittently for pain. Tr. 2215. Dr. Tozzi advised that Alexander could begin partial weightbearing as tolerated and instructed her to follow up in three weeks for x-rays. Tr. 2215. Dr. Tozzi provided Alexander with a referral for rehab and advised her that complete recovery could take 6 months to a year. Tr. 2215. Also, Dr. Tozzi advised Alexander that she could expect intermittent swelling as her activity increased. Tr. 2215. Dr. Tozzi provided Alexander with a prescription for Motrin 800 mg. Tr. 2215.

Alexander saw Dr. Tozzi again for post-op follow up on December 7, 2011. Tr. 2215. Dr. Tozzi observed that Alexander's wounds were benign and her neurovascular status was intact. Tr. 2215. Dr. Tozzi also observed that Alexander had some mild edema in her left foot,

which Dr. Tozzi indicated was expected given the extent of the surgery.  Tr. 2215.  Alexander had been attending physical therapy.  Tr. 2215.  Dr. Tozzi indicated that Alexander's x-rays looked excellent and her bone graft appeared to be "healing nicely in excellent position."  Tr. 2215.  Dr. Tozzi again discussed with Alexander that it would take time for her to heal and that she should continue with physical therapy and continue challenging herself weightbearing.  Tr. 2215.  Dr. Tozzi believed that it would be another month or two before Alexander could wear a shoe.  Tr. 2215.

Alexander started physical therapy on December 1, 2011, at NovaCare Rehabilitation.  Tr. 2326-2329, 2345.  Alexander cancelled or did not show for physical therapy appointments on December 5, 7, and 9th.  Tr. 2332-2334.   She attended therapy on December 12 and December 15 (Tr. 2335-2344) but no showed for her December 22 appointment (Tr. 2346).

On December 22, 2011, Alexander saw Dr. Fumich.  Tr. 2357.  She was in a post-op boot.  Tr. 2357.  She was still having pain and discomfort but Dr. Fumich noted that it was early in the post-operative process.  Tr. 2357.   On December 28, 2011, Alexander was discharged from physical therapy due to non-compliance.  Tr. 2347-2349.

In January and February 2012, Alexander continued to report pain and discomfort to Dr. Fumich in both the left foot, which had undergone surgery, and the right.  Tr. 2357.  During a February 9, 2012, visit with Dr. Fumich, Dr. Fumich indicated that authorization for MRIs of the left and right foot would be requested.  Tr. 2357.  It was noted that Alexander was "minimal ambulatory" and could "stand for minimal periods of time due to severe pronated flatfeet and degenerative conditions."  Tr. 2357.   On May 3, 2012, Dr. Fumich noted that MRIs of Alexander's feet were fine.  Tr. 2357.  He ordered MRIs of her ankles.  Tr. 2537.  On May 22, 2012, Dr. Fumich reviewed the MRIs of Alexander's ankles.  Tr. 2357.  Dr. Fumich indicated

that the MRI on the left side showed "surgical alterations to the Achilles, partial tear and healing from the lengthening, but the most important finding [was] that the calcaneus shows a[n] ununited osteotomy from the October 2011 surgery." Tr. 2357. Dr. Fumich ordered a CT scan to further evaluate the matter. Tr. 2357. The MRI of the right ankle "showed more chronic changes, no tearing of the ligaments, some chronic sinus tarsitis. No OCD, chronic Grade II lateral collateral strain." Tr. 2357. On June 7, 2012, Dr. Fumich noted that CT scans further confirmed the nonunion of the osteotomy site from the prior left calcaneal surgery performed by Dr. Tozzi. Tr. 2357, 2372-2373. Dr. Fumich recommended arch supports for both feet, along with ice and anti-inflammatories for the right posterior tib tendonitis. Tr. 2357. Alexander planned to obtain a second opinion from Dr. Seferra. Tr. 2357.

Alexander saw Dr. Seferra and, on November 15, 2012, Dr. Fumich indicated that Alexander had been using a boot and stimulator for 3 months. Tr. 2358. Dr. Fumich indicated that Alexander was going to proceed with a CT scan and further consultation with Dr. Seferra. Tr. 2358. A January 10, 2013, CT scan of the left foot showed no acute fractures or dislocations. Tr. 2378. A small enthesophyte formation was present at the Achilles tendon. Tr. 2378.

On November 5, 2013, Alexander saw Dr. Fumich and reported continued pain and discomfort. Tr. 2358. On November 18, 2013, Alexander saw Dr. Tozzi. Tr. 2381-2382. Dr. Tozzi took x-rays which showed a failed bone graft with nonunion. Tr. 2382. Dr. Tozzi recommended surgery to perform a new graft. Tr. 2382.

In January 2014, Alexander elected to proceed with bone graft surgery for the failed fusion with nonunion. Tr. 2715. On February 12, 2014, Alexander saw Dr. Tozzi three weeks post-op. Tr. 2713-2714. Alexander was progressing nicely. Tr. 2713. Dr. Tozzi removed the short leg fiberglass cast. Tr. 2713. Alexander was having some problems using the bone growth

stimulator over the cast.  Tr. 2713.  Dr. Tozzi suggested that Alexander call the rep so that she could start using the external bone growth stimulator as soon as possible.  Tr. 2724.  Dr. Tozzi did not replace Alexander's cast.  Tr. 2713.  Since Alexander had a wheelchair, Dr. Tozzi placed her in a high-top CAM Walker boot.  Tr. 2713.  On March 5, 2014, Alexander was continuing to use the CAM Walker and Dr. Tozzi recommended that Alexander continue with protected weightbearing activity in the CAM Walker.  Tr. 2711.  Alexander was continuing to use a bone growth stimulator.  Tr. 2711.  Overall, Dr. Tozzi felt pleased with Alexander's progress in 6 weeks.  Tr. 2711.  During a follow-up visit with Dr. Tozzi on April 9, 2014, Alexander was "doing very well."  Tr. 2720.  Alexander had no unusual complaints other than some post-op swelling.  Tr. 2720.  She was using her CAM Walker.  Tr. 2720.  Dr. Tozzi recommended that Alexander start therapy and return in one month with her regular shoe to see if she could begin using.  Tr. 2720.  On May 7, 2014, Tozzi indicated that Alexander was recovering uneventfully.  Tr. 2719.  Dr. Tozzi advised Alexander to "interface her orthotic back into her shoes."  Tr. 2719.  Alexander was using a cane and had intermittent swelling.  Tr. 2719.  Dr. Tozzi advised Alexander that her graft was probably 70-75% healed and it would take an additional 2-3 months before Alexander was completely recovered.  Tr. 2719.

On July 9, 2014, Alexander saw Dr. Tozzi because she had rolled her left ankle.  Tr. 2718.  Her ankle was sprained.  Tr. 2718.  Dr. Tozzi took an x-ray.  Tr. 2718.  Alexander's hardware was intact and there was no evidence of failure/fracture.  Tr. 2718.  Dr. Tozzi provided Alexander with instructions on how to treat her sprained ankle, sent her for an aircast and brace, and recommended that she rest, apply ice, and elevate her ankle.  Tr. 2718.  On July 30, 2014, Alexander saw Dr. Tozzi for follow up.  Tr. 2717.  Dr. Tozzi observed that Alexander's left ankle was swollen.  Tr. 2717.  Alexander was using ice but no brace.  Tr. 2717.  Dr. Tozzi

recommended that Alexander perform range of motion exercises at home with resistance/Ace bandage.  Tr. 2717.  Dr. Tozzi instructed Alexander to return if a new problem developed.  Tr. 2717.

### 2. Opinion evidence

#### a. Treating physicians

**Dr. Fumich**

*January 5, 2012*

In a "To Whom it May Concern" letter/report dated January 5, 2012, Dr. Fumich indicated that Alexander had a severe congenital foot condition with severe valgus deformity, posterior tibial tendon dysfunction, paratalar subluxation, and short Achilles tendon.  Tr. 2322. Dr. Fumich indicated that Alexander's conditions were preexisting congenital conditions causing ongoing left foot pain due to her work activities.  Tr. 2322.  Dr. Fumich opined that, as a result of her chronic conditions and the work activities of standing/walking 8 hours a day, Alexander required surgical intervention.  Tr. 2322.  Also, Dr. Fumich opined that Alexander's congenital conditions were substantially aggravated by her work activities.  Tr. 2322.

*February 20, 2012*

On February 20, 2012, Dr. Fumich completed a Medical Source Statement Regarding Leg/Foot Impairment(s).  Tr. 2323-2324.  Dr. Fumich indicated that Alexander had foot pain and a diagnosis of "flat foot."  Tr. 2323.  Dr. Fumich opined that Alexander could sit for less than 2 hours in an 8-hour workday; stand/walk for less than 2 hours in an 8-hour workday; and stand at one time for 0-5 minutes.  Tr. 2323.  Dr. Fumich opined that Alexander would need to frequently elevate her leg(s) above the heart for 30-60 minutes at a time due to pain.  Tr. 2323.  Dr. Fumich opined that Alexander was not able to: walk a block at a reasonable pace on rough or uneven

surfaces, walk enough to shop or bank, and/or climb a few steps at a reasonable pace with the use

of a single handrail.  Tr. 2323.  Dr. Fumich opined that Alexander suffered from pain that was

marked – a serious limitation, severely limiting ability to function, i.e., on task 48%-82% in an 8-

hour workday.  Tr. 2323.

### Dr. Tozzi

On October 11, 2011, Dr. Tozzi completed a Medical Source Statement Regarding

Leg/Foot Impairment(s).  Tr. 2110-2111.  Dr. Tozzi indicated that Alexander was totally

disabled and unable to sit and/or stand/walk during an 8-hour workday.  Tr. 2110.  Dr. Tozzi also

indicated that Alexander was post-surgical and needed to elevate her leg(s) most of the time.

Tr. 2110.  Dr. Tozzi opined that Alexander suffered from pain that was marked.  Tr. 2111.  Dr.

Tozzi commented that Alexander "had surgery 10-5-11.  Disability 3 to 6 months."  Tr. 2111.

### b.    Consultative physician

On September 28, 2010,[4] consultative examining physician Naomi Waldbaum, M.D.,

evaluated Alexander.  Tr. 1964-1967.  Alexander was using a cane during the evaluation and

ambulated in  a slow, careful, limping manner.  Tr. 1965.  Alexander had difficulty getting out of

her chair and required assistance.  Tr. 1965.  Alexander's boyfriend accompanied her during the

evaluation and he was needed to assist Alexander with activities.  Tr. 1965.  Dr. Waldbaum

observed that Alexander was dependent on her boyfriend and, while she had significant

difficulties and pain, these symptoms may have been slightly exaggerated.  Tr. 1965.  Dr.

Waldbaum concluded,

> [Alexander] presents today with severe ongoing chronic pain related to the neck,
> the back, left shoulder, and left ankle.  She walks with a cane which is obligatory
> and she requires full time assistance for all activities of daily living.  She is being

---

[4] The evaluation report is dated September 29, 2010.  Tr. 1964.

evaluated by a neurosurgeon in the near future and for possible foot surgery also in the near future. . . At this point in time, [Alexander] is totally disabled.

Tr. 1967.

### c. Reviewing physicians

On October 15, 2010, state agency reviewing physician Leigh Thomas, M.D., reviewed Alexander's records and offered her opinion regarding Alexander's physical impairments. Tr. 158-163. Dr. Thomas opined that Alexander had the following exertional limitations: occasionally lift and/or carry 10 pounds; frequently lift and/or carry less than 10 pounds; stand and/or walk for a total of 2 hours; sit for a total of 6 hours in an 8-hour workday; and push and/or pull unlimitedly, other than as shown for lift and/or carry. Tr. 161. Dr. Thomas further explained the exertional limitations, stating that Alexander retained the ability to stand/walk for 15 minutes of every hour for a total of 2 hours in an 8-hour workday and retained the ability to lift up to 5 pounds. Tr. 161. Dr. Thomas opined that Alexander had the following postural limitations: never climbing ladders/ropes/scaffolds; and occasional balancing, stooping, kneeling, crouching, and crawling. Tr. 161-162. Dr. Thomas further explained the postural limitations, stating that Alexander should avoid all hazardous climbing because of problems with her lumbar/cervical spine and left foot. Tr. 162. Dr. Thomas opined that Alexander's reaching in any direction was limited in the front and/or laterally, left overhead, and right overhead and she was unable to perform overhead bilateral reaching. Tr. 162.

Upon reconsideration, on December 28, 2010, state agency reviewing physician Myung Cho, M.D., affirmed the earlier opinion rendered by Dr. Thomas. Tr. 183-185.

### C.    Testimonial evidence

### 1.    Plaintiff's testimony

At the March 4, 2014, hearing, Alexander was represented and testified.[5]  Tr.  103-118.
Alexander appeared at the March 4, 2014, hearing in a wheelchair and carrying a cane.  Tr. 104-
105.  Alexander stated she had been using a wheelchair for two months due to a recent surgery
on her foot.  Tr. 104.   Alexander indicated that she was not supposed to put pressure on her foot
and was required to use the wheelchair for three months.  Tr. 105.  In addition to the problems
with her feet, Alexander indicated that she has problems with her back, neck and shoulders, bad
headaches, depression and high blood pressure.  Tr. 106-107.  Alexander needs to use her cane or
have someone assist her when she rises from a sitting to a standing position because her back
stiffens up when she is sitting.  Tr. 116-117.

Alexander has a herniated disc in her back which limits her ability to bend or stand for a
long period of time.  Tr. 108.  Also, walking and sitting are difficult for Alexander.  Tr. 108,
114.  She estimated being able to stand for about 5 or 10 minutes.  Tr. 108.  She can sit for a
couple of hours and because of the wheelchair she does not have much choice but to sit.  Tr. 108.
Alexander has problems turning her neck and head and has headaches almost daily.  Tr. 114,
115.  Also, she has problems lifting her left arm.  Tr. 114.   Alexander has some problems
sleeping. Tr. 115.  It is not as bad when uses the CPAP but she is still tired the next day.  Tr. 115-
116.

Alexander's problems with her feet started in 2009 when she was working.  Tr. 114.  All
of a sudden, both of her feet became flatfooted and then turned into plantar fasciitis.  Tr. 114.  In

---

[5] Alexander also testified and was represented at the February 7, 2012, hearing.  Tr. 63-77.

October 2011, Alexander had surgery on her left foot because of plantar fasciitis.  Tr. 114.  The

surgery involved reconstruction of her arch with a bone graft and a nerve from her Achilles.  Tr.

114-115.  The same thing happened to her right foot.  Tr. 115.

Alexander was asked to describe an average day prior to her recent foot surgery.  Tr. 108.

She indicated that her days were filled with a lot of doctor appointments and just trying to take

care of basic things like getting dressed and eating.  Tr. 108-109.  Also, she did some physical

therapy exercises throughout the day for her back.  Tr. 109.  Alexander's husband drives her

places.  Tr. 109.  She is able to prepare her own food but her husband does the household chores.

Tr. 109, 110.  Alexander enjoys spending time with her grandchildren when they visit.  Tr. 110.

She might read a book.  Tr. 110.  She occasionally does some grocery shopping.  Tr. 111.

Alexander does not go shopping alone.  Tr. 116.  She goes with her daughter or husband.  Tr.

116.

### 2.    Vocational Expert

Vocational Expert ("VE") Alfreda Bell testified at the March 4, 2014, hearing.  Tr. 118-

130.  The VE described Alexander's past work as a postal clerk, a light, semi-skilled position.

Tr. 118-119.

For the first hypothetical, the ALJ asked the VE to consider an individual with the

following limitations: can lift/carry 20 pounds occasionally and 10 pounds frequently; walk and

stand 4 out of 8 hours a day, 20 minutes at a time; sit 6 out of 8 hours a day; frequently push/pull,

never foot pedal; occasionally use a ramp or stairs, never a ladder, rope or scaffold; frequently

balance; occasionally stoop, kneel and crouch; never crawl; reach overhead occasionally with the

left and frequently with the right; handling, fingering and feeling are all constant; visual

capabilities and communication skills are all constant; should avoid dangerous machinery and

unprotected heights; and can perform low-level complex and unskilled tasks (SVP 1-3).  Tr. 119-120.  The VE indicated that the described individual would be unable to perform Alexander's past work but there would be other jobs that the described individual could perform, including (1) mail sorter (non-postal clerk position); (2) marking clerk; and (3) routing clerk.  Tr. 120-122.  The VE provided regional and national job incidence numbers for the jobs identified.  Tr. 120-122.

For the second hypothetical, the ALJ asked the VE to consider the same individual as described in the first hypothetical except that the individual could lift/carry 20 pounds occasionally and 10 pounds frequently; walk and stand 2 out of 8 hours per day, 20 minutes at a time; and sit 6 out of 8 hours per day, 2 hours at a time.  Tr. 122.  The VE indicated that the mail sorter, marking clerk and routing clerk positions would still remain available.  Tr. 122.   The VE clarified that, because of the walking and standing requirements, the number of jobs available would need to be reduced.  Tr. 127-128.  The reduced job incidence numbers for the jobs identified in response to the second hypothetical were 400 jobs regionally and 40,000 jobs nationally for the mail sorter position; 500 jobs regionally and 55,000 jobs nationally for the marking clerk position; and 300 jobs regionally and 30,000 jobs nationally for the routing clerk position.  Tr. 129.

The ALJ then asked the VE to consider a sedentary exertional level hypothetical.  Tr. 122.  The VE indicated that the following positions would be available: (1) order clerk; (2) receptionist; and (3) billing clerk.  Tr. 122-123.

In response to claimant's counsel's questioning, the VE indicated that, if an individual was off-task greater than 5% of the time, there would be no jobs available for the individual.  Tr.

129-130.  Also, if an individual missed work three or more days in a month, the individual would be unable to sustain employment.  Tr. 130.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[6] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[7] claimant is presumed disabled without further inquiry.

---

[6] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[7] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his September 29, 2014, decision, the ALJ made the following findings:[8]

1.      Alexander meets the insured status requirements through December 31, 2015.  Tr. 220.

2.      Alexander has not engaged in substantial gainful activity since February 27, 2010, the amended alleged onset date.  Tr. 220.

3.      Alexander has the following severe impairments: cervical disc herniation, degenerative disc disease of the cervical and lumbar spines, obstructive sleep apnea, obesity, affective disorder, and personality disorder.  Tr. 220-221.

4.      Alexander does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listings.  Tr. 221-223.

5.      Alexander has the RFC to perform light work except lifting 20 pounds occasionally and 10 pounds frequently, standing and walking for 2 hours in an 8-hour day and 20 minutes at a time, sitting for 6 hours in an 8-hour day and 2 hours at a time, frequent push/pull but never foot pedal,

---

[8] The ALJ's findings are summarized.

occasionally climb ramps and stairs but never ladders, ropes or scaffolds, frequently balance, occasionally stoop, kneel or crouch, never crawl, occasional reaching overhead with the left upper extremity but frequent reaching with the right, constant handling, fingering or feeling, visual and communication skills are all constant, must avoid dangerous machinery and unprotected heights, and limited to tasks with SVP of 1-3. Tr. 223-227.

6.    Alexander is unable to perform any past relevant work.  Tr. 227.

7.    Alexander was born in 1965 and was 45 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 227.

8.    Alexander has at least a high school education and is able to communicate in English.  Tr. 227.

9.    Transferability of jobs skills is not material to the determination of disability.  Tr. 227.

10.   Considering Alexander's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Alexander can perform, mail sorter, marketing clerk, and routing clerk.  Tr. 227-228.

Based on the foregoing, the ALJ determined that Alexander had not been under a disability, as defined in the Social Security Act, from February 27, 2010, through the date of the decision.  Tr. 228.

## V. Parties' Arguments

First, Alexander argues that the ALJ's evaluation of Dr. Fumich's February 20, 2012, opinion and assignment of "some weight" to that opinion did not comport with the treating physician rule because the ALJ ignored evidence supporting Dr. Fumich's opinion and the decision did not adequately explain which of Dr. Fumich's limitations were rejected and why. Doc. 15, pp. 10-12, Doc. 20, pp. 1-3.  Next, Alexander argues that the RFC finding is not supported by substantial evidence because the ALJ did not find that her foot impairment was a severe impairment at Step Two, the decision lacks analysis of the evidence regarding her foot

impairment, and the RFC failed to account for her foot impairment.  Doc. 15, pp. 13-15.  Finally, Alexander contends that the ALJ also erred by not properly analyzing her foot impairment at Step Three.  Doc. 15, pp. 15-18.

In response, the Commissioner argues that the ALJ provided good reasons for the weight assigned to Dr. Fumich's February 20, 2012, opinion and explained the weight assigned.  Doc. 18, pp. 7-11.  Alternatively, the Commissioner argues that, to the extent that the ALJ did not adequately articulate which portions of Dr. Fumich's opinion the ALJ assigned "some weight" to and which portions the ALJ gave no weight to, error, if any, was harmless.  Doc. 18, pp. 7-11.  Next, the Commissioner argues that, although the ALJ did not find Alexander's foot impairment to be a severe impairment, the ALJ found other impairments to be severe, discussed at length Alexander's foot impairment, and the RFC is supported by substantial evidence.  Doc. 18, pp. 11-13.  Lastly, the Commissioner argues that the ALJ's Step Three finding is supported by substantial evidence because the evidence does not support a listing level impairment.  Doc. 18, pp. 13-14.

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.     The ALJ properly considered and explained the weight assigned to Dr. Fumich's February 20, 2012, opinion**

Alexander challenges the ALJ's evaluation of Dr. Fumich's February 20, 2012, opinion, arguing that the ALJ ignored evidence supporting Dr. Fumich's opinion and the decision did not adequately explain which of Dr. Fumich's limitations were rejected and why.  Doc. 15, pp. 10-12, Doc. 20, pp. 1-3.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent

reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c). An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

After discussing details of Alexander's impairments, including her foot problems (Tr. 224), the ALJ considered and weighed the medical opinion evidence (Tr. 225-227). With respect to Dr. Fumich's opinions, the ALJ explained:

> Some weight is given to the medical source statement completed by Dr. Fumich dated February 20, 2012 where he noted that Ms. Alexander has foot pain and can sit for less than two hours in an eight hour day and stand/walk for less than two hours and standing for up to five minutes at a time as he completed the questionnaire four months after her osteotomy and she had a non-union fusion at the time [Exhibit 27F]. However, little weight is given to the report from Dr. Fumich dated February 5, 2012,[9] which indicated that Ms. Alexander has a severe congenital foot condition as if it was a congenital condition, she probably would not have been able to work on her feet at the post office for so many years as she did [Exhibit 26F].

Tr. 226.

Alexander challenges the ALJ's consideration of Dr. Fumich's February 20, 2012, not the ALJ's consideration of the Fumich's February 5, 2012, opinion. Doc. 15, p. 11, Doc. 20.

---

[9] The opinion found at Exhibit 26F is dated January 5, 2012, not February 5, 2012. Tr. 2322.

Alexander first argues that the ALJ did not adequately explain which limitations from Dr. Fumich's February 20, 2012, opinion were rejected.  Contrary to Alexander's claim, the ALJ specifically identified which portions of Dr. Fumich's February 20, 2012, opinion the ALJ was assigning some weight to and his rationale for assigning that weight.  Tr. 226.  The ALJ did not specifically mention Dr. Fumich's marked limitations or elevation requirements that were included in the February 20, 2012, opinion, but the ALJ did discuss and provide only little weight to Dr. Fumich's February 5, 2012, opinion that Alexander's foot condition was severe and the ALJ also provided no weight to Dr. Tozzi's October 11, 2011, opinions that elevation was necessary and that Alexander was totally disabled.  Tr. 226.  The ALJ also provided some weight to the state agency reviewing physicians' opinions, finding that their opinions that Alexander could stand and walk up to 2 hours a day and sit for 6 hours in an 8-hour day were consistent with the evidence of record.  Tr. 225.  In light of the foregoing, it is clear from the decision that, while the ALJ found evidence to support Alexander's physician's opinion that Alexander had pain and limitations associated with her foot problems, the ALJ did not find that the evidence supported Dr. Fumich's February 20, 2012, opinion that suggested that any such limitations were marked, severe or totally disabling.

Alexander also contends that the ALJ violated the treating physician rule because the ALJ ignored evidence when determining the weight to assign to Dr. Fumich's February 20, 2012, opinion.  In particular, she asserts that the "ALJ ignores the fact that Dr. Fumich began an exhaustive workup including multiple imaging studies to determine the cause of the pain and worked collaboratively with Dr. Tozzi which ultimately led to second surgery in 2014 to correct the 'failed' first surgery."  Doc. 15, p. 12.  Alexander's argument is without merit.  As is clear

from the decision, the ALJ considered Alexander's treatment history for her foot dating back to 2009 and continuing through 2014 when Dr. Tozzi performed a second surgery.  Tr. 224.

Considering the foregoing, the Court finds that the ALJ sufficiently explained the weight assigned to Dr. Fumich's February 20, 2012, opinion and did not ignore evidence when evaluating Dr. Fumich's opinion.  Further, the ALJ did not completely dismiss Dr. Fumich's opinions or Alexander's subjective complaints.  The ALJ limited Alexander exertionally in the RFC to lifting 20 pounds occasionally and 10 pounds frequently, standing and walking for 2 hours in an 8-hour day and 20 minutes at a time, sitting for 6 hours in an 8-hour day and 2 hours at a time, and frequent push/pull but never foot pedal.  Tr. 223.

Based on the foregoing, the undersigned finds that the ALJ properly and sufficiently explained his decision to provide some weight to Dr. Fumich's February 20, 2012, opinion and that decision is supported by substantial evidence.

## C.    The ALJ properly considered and accounted for Alexander's foot impairment at Step Two and in formulating the RFC

Alexander argues that the ALJ erred at Step Two and in formulating the RFC because the ALJ did not find a severe impairment related to her feet or provide any analysis of the evidence pertaining to her foot impairment.    Doc. 15, pp. 13-15.

At Step Two, a claimant must show that she suffers from a severe medically determinable physical or mental impairment that meets the duration requirement in 20 C.F.R. § 404.1509,[10] or a combination of impairments that is severe and meets the duration requirement.  20 C.F.R. § 404.1520(a)(4)(ii).  It is Alexander's burden to show the severity of her impairments.  *Foster v. Sec'y of Health & Human Svcs.,* 899 F.2d 1221, *2 (6th Cir. 1990) (unpublished) (citing *Murphy*

---

[10] The duration requirement provides that "Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."  20 C.F.R. § 404.1529.

*v. Sec'y of Health & Human Svcs.*, 801 F.2d 182, 185 (6th Cir. 1986). An impairment is not considered severe when it does not significantly limit the claimant's physical or mental ability to do basic work activities (without considering the claimant's age, education, or work experience).[11] *Long v. Apfel*, 1 Fed. Appx. 326, 330-332 (6th Cir. 2001); 20 C.F.R § 404.1521(a).

The Sixth Circuit has construed Step Two as a *de minimis* hurdle such that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). However, as noted by the *Higgs* court, a diagnosis alone "says nothing about the severity of the condition." *Id.* at 863.

Additionally, where an ALJ finds one severe impairment and continues with subsequent steps in the sequential evaluation process, error, if any, at Step Two may not warrant reversal. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the Commissioner's failure to find claimant's cervical condition severe was not reversible error because the Commissioner did find a severe impairment and continued with the remaining steps in the sequential evaluation process)*; see also Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. 2008) (relying on *Maziarz* when finding that, because the ALJ had found other impairments severe, the fact that some other impairments were found to be non-severe at Step Two was not reversible error).

Alexander challenges the ALJ's Step Two finding because the ALJ did not find her foot impairment to be a severe impairment. Doc. 15, p. 14. Even if Alexander could demonstrate

---

[11] Basic work activities are defined by the regulations as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). Examples, include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) the capacity to see, hear and speak; (3) the ability to understand, carry out, and remember simple instructions; (4) use of judgment; (5) ability to respond appropriately to supervision, co-workers, and usual work situations; and (6) the ability to deal with changes in a routine work setting. *Id.*

error with respect to the ALJ's finding that her foot problems did not constitute a severe impairment, reversal is not warranted because the ALJ found that Alexander had severe impairments, i.e., cervical disc herniation, degenerative disc disease of the cervical and lumbar spines, obstructive sleep apnea, obesity, affective disorder, and personality disorder, at Step Two (Tr. 220-221), and proceeded with subsequent steps in the sequential analysis (Tr. 221-228). Furthermore, contrary to Alexander's claim, it is clear that the ALJ considered Alexander's allegations regarding her foot problems. Tr. 224. For example, the ALJ specifically acknowledged that Alexander "had complaints of foot pain since at least March 2009" and proceeded to discuss Alexander's treatment history with both Dr. Fumich and Dr. Tozzi for her foot problems as well as objective test results. Tr. 224.

The ALJ did not ignore or disregard Alexander's foot problems. Based on consideration of all the evidence, including allegations and medical evidence regarding Alexander's foot problems, the ALJ concluded that Alexander had physical RFC limitations, including:

> [L]ifting 20 pounds occasionally and 10 pounds frequently, standing and walking for two hours in an eight hour day and 20 minutes at a time, sitting for six hours in an eight hour day and two hours at a time, frequent push/pull but never foot pedal, occasional climb ramps and stairs but never ladders, ropes or scaffolds, frequent balance, occasional stoop, kneel or crouch, never crawl, occasional reaching overhead with the left upper extremity but frequent reaching with the right, constant handle, finger, or feel.

Tr. 223.

When assessing Alexander's RFC, among other evidence considered, the ALJ relied upon and gave some weight to the state agency reviewing physicians' opinions, finding their opinions that Alexander could stand and walk up to two hours a day and sit for six hours in an eight hour day consistent with the evidence of record. Tr. 225.

Accordingly, even if it was determined that the ALJ incorrectly found Alexander's foot problems to be a non-severe impairment, the ALJ proceeded to subsequent steps in the sequential evaluation process and Alexander has not shown that the ALJ failed to consider her allegations with respect to her foot problems when assessing her RFC or that the RFC is not supported by substantial evidence.  Thus, reversal and remand is not warranted based on the ALJ's Step Two determination.

**D.      Reversal and remand is not warranted based on the ALJ's Step Three determination**

Alexander argues that remand is warranted because the ALJ did not determine whether her arch collapse met Listing 1.02, 1.03 or 1.06.  Doc. 15, pp. 15-18.

At Step Three of the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 416.920(a)(4)(iii).  The claimant bears the burden of establishing that her condition meets or equals a Listing.  *Johnson v. Colvin*, 2014 U.S. Dist. LEXIS 50941, *7 (6th Cir. 2014) (citing *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987).   A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Thacker v. SSA*, 93 Fed. Appx. 725, 728 (6th Cir. 2004).

Alexander acknowledges that Listing 1.02, 1.03 and 1.06 all require evidence that the claimant has an inability to ambulate effectively.  Doc. 15, pp. 16-17.  Under the Listings, what it means to ambulate effectively is explained as follows:

b. What We Mean by Inability To Ambulate Effectively

(1)      Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.

25

Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2)    To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. pt. 404, subpt. P, App. 1, pt. A1, § 1.00B2b.

In order to demonstrate an inability to ambulate effectively, Alexander points to evidence that she has a significant limp; that her pain is aggravated by activity; that she has had to use a cane to use the restroom; that she reports being unable to walk for more than 20 feet without stopping and sitting; and that Dr. Waldman observed a limp and use of a cane and indicated that use of a cane was "obligatory."  Doc. 15, p. 17.  However, ineffective ambulation is "defined generally as having insufficient lower extremity functioning. . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. pt. 404, subpt. P, App. 1, pt. A1, § 1.00B2b(1) (emphasis supplied); *see also* 20 C.F.R. pt. 404, subpt. P, App. 1, pt. A1, § 1.00B2b(2) ("[E]xamples of ineffective ambulation include, but are not limited to, the inability to walk without . . . two canes . . .").  Thus, the use of a cane would not limit the functioning of both of Alexander's upper extremities.  Further, to the extent that Alexander relies upon her own subjective allegations

26

regarding her limitations, the ALJ considered Alexander's own subjective statements but found her statements not entirely credible.[12]  Tr. 225.

Based on the foregoing, while the ALJ did not specifically cite to Listings 1.02, 1.03, and 1.06 at Step Three, Alexander has failed to demonstrate evidence to establish a Listing level impairment.  Thus, reversal and remand is not warranted for further analysis at Step Three.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: February 16, 2017

Kathleen B. Burke
United States Magistrate Judge

---

[12] Alexander has not separately challenged the ALJ's credibility assessment.